H. D. ESTABROOK V. MRS. E. W. HATEROTH.

[FILED NOVEMBER 6, 1889.]

Forc ble Entry and Detainer: EVIDENCE: PRACTICE.   In an action of forcible entry and detainer there was testimony tending to show that one Mrs. M. was possessed of a half interest in certain premises; that to secure her rights she entered into a contract with one E., an attorney, to prosecute an action in her behalf, if necessary, and enforce her claim; that the attorney, without suit, obtained a recognition of her claim by the adverse party, and Mrs. M. thereupon took possession of the premises jointly with E. and the owner of the adverse interest, and that E. collected rents from certain tenants with the consent of Mrs. M. E. also obtained judgment of ouster against a tenant, who thereupon took a lease from him.   Mrs. M. made a deed to the holder of the adverse interest, which was not introduced in evidence. *Held*, That the testimony failed to show that E. was a trespasser and not entitled to the possession of the premises and rents, and that the questions of fact should have been submitted to the jury.

ERROR to the district court for Douglas county. Tried below before DOANE, J.

*Estabrook, Irvine & Clapp,* for plaintiff in error:

The object of forcible entry and detainer is to protect actual possession, whether rightful or not, against unlawful invasion (*Myers v. Koenig,* 5 Neb., 422; *People v. Leonard,* 11 Johns., 504; *St. L., etc., Ass'n v. Reinecke,* 21 Mo. App., 478; *Lorimer v. Lewis,* Morris (Ia.), 253*); hence the fact alone of Estabrook's possession needs to be established. · The judgment of eviction against Davis ended his former lease and left him free to accept one from plaintiff (*Burr v. Stenton,* 52 Barb., 377; *Morse v. Goddard,* 13 Metc. [Mass.], 177); and Davis's possession under such lease was that of plaintiff. (*Langworthy v. Myers,* 4 Cole [Ia.], 18.) Where one, for any time, exercises the usual acts of ownership, he may maintain this action against all save one whom he has forcibly disseised, and even against latter if he has not continuously resisted such acts. (*Bowers v. Cherokee Bob,* 45 Cal., 503; *St. L., etc., Ass'n v. Reinecke,* and *Langworthy v. Myers, supra; Bradley v. West,* 60 Mo., 59.) The acts of Davis were insufficient to deprive plaintiff of his possession. (*Gallagher v. Connell,* 23 Neb., 391.) One of two co-tenants may maintain this action against a stranger. (*Crook v. Vandervoort,* 13 Neb., 507; *Turner v. Limbrick,* 1 Meigs [Tenn.], 7.)

*John L. Webster,* for defendant in error:

Estabrook cannot maintain this action against defendant, who is tenant of real owner. (*Haller v. Blaco,* 14 Neb., 195.) Vorce had a right to place a tenant in possession. (Taylor, Land. & Ten., secs. 531, 532, and cases cited in N. 1, 788; *Wood v. King,* 43 N. Y., 152.) Right of possession may be examined in this form of action, and, incidentally, title of one in possession. (*Smith v. Kaiser,*

17 Neb., 187; *Leach v. Sutphen*, 11 Id., 528.)   Vorce as owner could have dispossessed either Estabrook or his tenant, Davis. (*Cox v. Cunningham*, 77 Ill., 445.)   A mere *scrambling* possession, such as Estabrook's, was not sufficient to maintain this action.   (*Hayes v. Porter*, 27 Tex., 92; *House v. Keiser*, 8 Cal., 500; *Conroy v. Duane*, 45 Id., 601 ; *Com. v. Keeper*, 1 Ashmead [Pa.], 147 ; *Mann v. Bradley*, 67 Ill., 95.)

MAXWELL, J.

This case was before this court in 1887, and the opinion reported in 22 Neb., 282.   The facts in that case are briefly stated on pages 282-3 of that report.   On the second trial the court, on the conclusion of the plaintiff's evidence, directed a verdict for the defendant and dismissed the action.   It is claimed on behalf of the defendant in error that the proof fails to show any right of Estabrook to the possession of the premises.   The only witness called on the trial was the plaintiff himself, and he testified on his direct examination as follows :

Q. You are the plaintiff in this case?

A. Yes, sir.

Q. You may state what time you entered into possession of the property in dispute here, and under what circumstances.

By the court: Ask him if he was in possession and what the nature of his possession was.

Q. Do you know Margaret A. McCoy?

A. Yes, sir.

Q. State whether or not at any time you entered into a contract with her in regard to this property; and if so, what it was.

A. Here is a copy of it.   I don't know where the original is.

[The copy was introduced as evidence and is set out in the record.]

Q. Were you at that time a practicing attorney at law here?

A. Yes, sir.

Q. Who was in possession of this property at the time this contract was entered into?

A. They were the tenants of William Vorce, of New York, and Mr. Vorce at the time generally supposed himself the owner.

Q. Who were the owners?

A. As a matter of fact?

Q. Yes, sir. State what was done under that contract.

A. I first wrote to Mr. Vorce, of New York, inviting him—I entered into negotiations with Mr. Vorce for the premises, if possible. There was a dispute as to the ownership of the property, Mr. Vorce claiming an undivided half of the property and Mrs. McCoy a dower interest in the other undivided half. Mr. Vorce, through my suggestion, called upon his New York attorney—He conceded —I went into possession of this property. Mrs. McCoy went into possession of the double house, receiving the rentals and so on—herself and daughter lived in one side of this little frame cottage; I as owner of half of that— as the claiming owner—I took possession of the other side.

Q. Mrs. McCoy went into possession of the property in pursuance of the agreement with Vorce?

A. I have testified to that.

Q. When was that?

A. That was in '83; early in '83, or the latter part of '82, when we first went into possession.

Q. Now you may state whether or not you went into possession of any part of the property.

By the court: You had better ask him just what he did.

Q. After Mrs. McCoy took possession of that property, what, if any, arrangement was made between you and her in regard to it?

A. Mrs. McCoy told me to take the west side of the house, and we would simply keep possession till such time as Mr. Vorce and ourselves should partition or agree upon a partition, or have it done by the court.

Q. Then what was done in pursuance of that?

A. I took possession of the west side by renting it, by giving notice to the tenants and turning them out, by making arrangements, or at least discussing with architects in regard to fixing it up, and various other things.

Q. What time was it you took possession?

A. It was either in the latter part of '82 or the first part of '83.

Q. Soon after Mrs. McCoy took possession?

A. Immediately after.

Q. You took possession of the west half?

A. Yes, sir; the west half. I rented that and got the rent for it for several months, six months perhaps; four or five months anyhow.

Q. You may state what transaction, if any, passed between you and Mrs. McCoy in regard to changing possession of the west half for the east half?

A. A few days, I will say a week or two at the furthest before the deed made by Mrs. McCoy to Vorce, she came to my office and said the west side was a little better papered and fixed up and her daughter, who was living in the east side, would like to occupy that. They were identical, I think, with the exception, perhaps, the other was a little cleaner. It would be a great accommodation if I would give notice to my tenants and let her daughter have the other side. Accordingly I did that. I told my tenants to get out, gave them notice, and he vacated the premises, either the evening before or the very day that this deed of Mrs. McCoy's was made; there was not twenty-four hours elapsed between his getting out of there and this deed to Vorce.

Q. Then what became of the property?

A. Her daughter did take possession of that and Davis moved immediately into the east side as a tenant under Webster.

Q. The side you were to take?

A. Yes, sir.

Q. What did you do next?

A. Well, I brought a forcible detaining suit against Mr. Davis.

Q. Then what followed in regard to the possession of the property?

A. Why, Mr. Davis was turned out, and rented on the 20th day of July from me and took possession of that east side as my tenant.

Q. Was the lease to Davis in your handwriting?

A. Yes, sir.

Q. Have you it there?

A. Yes, sir.

Q. He entered under that lease?

A. Yes, sir.

Q. And how long did he remain?

A. Why, I think he remained there about two months; he remained there until the second month's rent became due.

Q. Did he pay you rent?

A. Yes, sir.

Q. How many months?

A. One.

Q. When the second month's rent became due what occurred?

A. He stood me off and the next time I went there I found Mrs. Hateroth in it.

Q. Did you know anything about Davis moving out before he did it?

A. No, sir.

Q. Did you know anything in regard to the manner in which Mrs. Hateroth obtained possession?

A. Only from what Mrs Hateroth tells me; I know it from that.

Q. What did you do upon finding Mrs. Hateroth in possession?

A. I had a talk there at the door one day with some lady, I don't know whether it was Mrs. Hateroth or her daughter, or who it was, in regard to how they came into possession and so on.

Q. I will ask you now what was said in regard to their getting into possession there at that time?

A. I can state what Mrs. Hateroth has said since then. I wouldn't say that it was Mrs. Hateroth I talked with at the door; I really had no recollection of this lady until I met her in the court house.

Q. State what, if anything, you have heard Mrs. Hateroth say since in regard to her taking possession.

A. I have heard Mrs. Hateroth say since that she was out looking for a house along about the 1st or 2d of September, '83, and that she went by this house and saw that it was vacant or pretty much so and that she looked in ; that the curtains were down, and the house was locked. She looked in at the window and saw some furniture there and inquired next door of Mrs. Shipley and learned that the parties had moved out or were moving out; that she would find the key at Mr. Webster's office; that she went to Mr. Webster's office and made the bargain for renting it and he referred her to Davis for the key ; that she went to Mr. or Mrs. Davis and got the key and took possession.

This testimony tends to show that at the time the contract with Mrs. McCoy was entered into she was the owner of at least one-half interest of the lot in question ; that she took possession of the lot jointly with Mr. Vorce and gave the plaintiff possession ; also that he was lawfully in possession when the deed from Mrs. McCoy to Vorce was executed. What that deed contained we have no means of

knowing, as it was not introduced as evidence in the case. It may have conveyed the title of Mrs. McCoy subject to the rights of the plaintiff.    The plaintiff was permitted by Vorce and Mrs. McCoy to collect rent on the premises for some months before the defendant took possession of the premises, and so far as appears the rent thus collected was considered to be his.    He also obtained judgment of ouster against Davis, who thereupon took a lease from him. Mrs. McCoy had agreed with the plaintiff to give him one-half of the net results if he succeeded in the case.    That he did succeed is clear, although without suit.    She thereupon, apparently in pursuance of the contract as she understood it, entered jointly into the possession of the premises with him.    His possession thus became rightful and could not be divested by force.    Whether or not the right of possession had lawfully terminated at the date in question is to be determined from the evidence in the case.

It is evident that the questions of fact should have been submitted to the jury, and the court erred in directing a verdict.    The judgment is therefore reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

THE other Judges concur.